STATE OF MAINE
*vs.*
ROBERT FIELD

Cumberland.   Opinion, February 14, 1961.

*Arthur Chapman* and *Clement Richardson,* for State.

*John Hanscom,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

WILLIAMSON, C. J.  On appeal.  The respondent was found guilty of rape and appeals from denial of a motion for a new trial.

The witnesses for the State were the prosecutrix and a deputy sheriff to whom she complained of the rape.  The only witness for the respondent was the physician who examined the prosecutrix at the request of the deputy sheriff.

The respondent did not take the stand.  ". . . the fact that he does not testify in his own behalf shall not be taken as evidence of his guilt."  R. S., c. 148, § 22.

In brief, the prosecutrix testified as follows:

As the prosecutrix was walking home on a Portland street at about twelve o'clock on a September night, a car with two men "pulled up next to me . . . I looked to see who it was, and it was nobody I knew, so I kept on walking." The respondent "spoke to me again.  I didn't answer him, so he got out and started walking next to me."

"Q.  What happened when you reached your home?
"A.  Well, I started to go up the stairs and Field walked halfway up the stairs with me.
            *   *   *   *   *   *   *   *   *
"Q.  What did Field say to you at your home?
"A.  He wanted to talk to me, and I didn't want to bother with him, because he had been drinking and he was quite drunk at the time.  And where I didn't know him, I didn't want to have anything to do with him.

"Q.  What did he say to you?
"A.  Well, he just said he wanted to talk to me, I still didn't know about what.

"Q.  What did you then do?
"A.  I told him, I said, 'I'm going in the house.' 'Well,' he says, 'I'm going to cause a disturbance; I want to talk to you.'  So I told him finally, I says, 'All right, if you want to talk without any trouble.'

I says, 'you can sit in the car and I'll sit next to the door and we'll talk.'

"Q. Did you get in the car?
"A. I did."

During the ten or fifteen minutes in which she was seated in the car the conversation was general, and no one molested her. Finally the respondent said, "Well, we'd better get going." Horne, the other man, was unable to start the car. At his request the prosecutrix steered the car while Horne and the respondent pushed. When the car started both men jumped in.

"Q. Did you have any talk to Field at this time?
"A. I asked him, I says, 'Now will you please take me home?'

"Q. What did he say?
"A. 'You're here whether you want to be or not.'
&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. Will you tell what happened when you reached Cook's quarry?
"A. I made up the excuse that I had to go to the bathroom, so Horne stopped the car. I got out and Field came with me. I told him I was quite capable of going by myself, but he seemed to want to go with me. So when we got to the end of the sandpit, I started running up the road. I got away from him and started running. I got about 100 yards, and he made a football tackle and down I went.

"Q. Then what did he say to you and what happened?
"A. He says, 'You get back in the car,' and he started dragging and pulling at me.

"Q. Did you get back into the car?
"A. Yes, with his help.

"Q. Now where did you go from Cook's gravel quarry?
"A. Out around the area of Forest Lake.

"Q. How do you know you were in the area of Forest Lake?

"A. Because I've been there millions of times during the summer.

"Q. What happened when you were out in Forest Lake?

"A. Well, Horne continued to drive the car. Field forced me into the back seat. There he had intercourse with me.

"Q. Did you resist Robert Field's advances?

"A. Yes, I did, but it didn't do any good.

"Q. Did he tear any of your clothing?

"A. No, he didn't.

"Q. Did he remove any of your clothing?

"A. Yes, he did.

"Q. What did he remove?

"A. My underpants.

"Q. Are you certain that he had intercourse with you?

"A. Yes, sir.

"Q. Now after this happened in regard to respondent Field, what happened?

"A. Then after he got through, I told him, I says, 'I want to go home; I want to go in the front seat,' I says, 'and I want you to take me home and please don't let Horne near me.' No, he couldn't see it that way, so they stopped the car just long enough to stop drivers. Field drove and Horne forced me in the back seat again where he took my pants off, too."

The men drove her to her home at about 12:40 A.M. On the respondent saying he would return the following Friday evening, she said, "If you want to come back you certainly can." She awoke her "girl friend." Within ten minutes they were at a police station where she talked with the

officer. Two hours later she made the complaint to the deputy sheriff. In the morning she identified the respondent, who denied knowing her. Her clothing was not torn or disarranged, except for a bent hook in her brassiere. She suffered no bruises.

The deputy sheriff testified that on making the complaint the prosecutrix "appeared very upset, mad, in fact fighting mad," that he arranged for her examination by a physician, and that on examination of the respondent the next morning he found no scratches or injuries.

The physician, testifying for the respondent, examined the prosecutrix at the Maine Medical Center at four o'clock in the morning, less than four hours from the time of the attack as stated by the prosecutrix. His testimony in part reads:

"Q. Now you made a physical examination of her outside body, the surface —
"A. Yes, sir.

"Q. (Continuing) — for marks of violence —
"A. Yes, sir.

"Q. (Continuing) - - scratches, bruises, and so forth, is that right?
"A. Yes, sir.....

"Q. You made a complete examination?
"A. Yes, sir.

"Q. Her whole body?
"A. Yes, sir.

"Q. What did you find?
"A. Nothing, sir.

"Q. Found no marks of violence whatsoever?
"A. No, sir.

"Q. You made an examination of her vagina?
"A. Yes, sir.

"Q. Did you find any tearing?

"A. No, sir. She admitted that she had had a child, and, therefore, there would be no evidence of bruising there, certainly.

"Q. No irritation that you could see?

"A. No, sir.

"Q. No inflammation?

"A. No, sir."

The elements of the crime of rape which the State must prove beyond a reasonable doubt are (1) carnal knowledge of a female, (2) by force, and (3) against her will. *State* v. *Dipietrantonio,* 152 Me. 41, 122 A. (2nd) 414. "Whoever ravishes and carnally knows any female of 14 or more years of age, by force and against her will . . . shall be punished . . ." R. S., c. 130, § 10.

Corroboration beyond the testimony of the prosecutrix is not required under our law to prove the crime of rape. In the absence of corroboration, the testimony of the prosecutrix must be scrutinized and analyzed with great care. If the testimony is contradictory, or unreasonable, or incredible, it does not form sufficient support for a verdict of guilty. *State* v. *Wheeler,* 150 Me. 332, 110 A. (2nd) 578; *State* v. *Newcomb,* 146 Me. 173, 78 A. (2nd) 787.

There is no evidence of actual force to overcome actual resistance by the prosecutrix. Resistance to meet force would have been disclosed in the physical condition of the prosecutrix, or in the condition of her clothing. There are no physical facts to testify to force or resistance.

The question remains, however, whether the prosecutrix submitted under the compulsion of fear. In such case the force may be said to be constructive. In *State* v. *Dipietrantonio, supra,* at p. 51, the following instruction was held to be proper:

"You have in your deliberations the right to consider as to whether or not. . . . was put under fear.

> There has been some testimony that she feared the respondent. It is for you to decide, and it is further for you to give such weight as to whether or not that fear prevented her from offering any greater resistance than she did offer, as you may find it. I again say to you that in order for you to find the respondent guilty, the act, that is admitted, must have been committed with force and without consent."

The testimony of fear as the compelling reason for submission is meager. On cross-examination the prosecutrix stated that at Forest Lake she was "panic stricken." We find little more in the record.

The words of Lord Chief Justice Hale in 1680 ring true after nearly three centuries:

> "It is true, rape is a most detestable crime, and therefore ought severely and impartially to be punished with death; but it must be remembered that it is an accusation easily to be made and hard to be proved; and harder to be defended by the party accused, tho never so innocent." Pleas of the Crown, I, 633, 635. (Quoted in 7 Wigmore on Evidence, 3rd ed. § 2061.)

Rape was punishable by death when Maine became a State. In 1829 the penalty was reduced to life imprisonment. This most detestable crime now carries imprisonment for any term of years. Few crimes in our law are punished with like severity. See Laws 1821, c. 3, § 1; Laws 1829, c. 430, § 5; R. S., c. 130, § 10.

On careful review of the record, we have grave doubts of the sufficiency of the evidence to warrant a verdict of guilty. There remains doubt and uncertainty that can be cured only by a new trial.

The entry will be

*Appeal sustained.*